HILL· *et al.*, commissioners, *v.* WADLEY SOUTHERN RAIL-
WAY COMPANY.

| 128 | 705 |
|-----|-----|
| 129 | 219 |

1. As the term is used in the statute of this State creating the railroad commission and providing for the fixing of rates by them, a "joint rate" is one prescribed to be charged for the transportation of goods or passengers over the connecting lines of two or more railroads, and to be divided among them for the service rendered by each respectively.

2. There is no fixed and arbitrary rule in the statute for the making of a joint rate. It is often done by deducting some prescribed per cent. from each of the local rates and adding together the two rates thus reduced; but this is not the only possible method of fixing a rate which will fall within the term, "joint rate," as used in the law.

3. Where the stock and bonds of one railroad company were owned by another, which connected with it, though having separate directors and being operated separately, and the railroad commissioners declared that a continuous-mileage rate should apply to both, applying the rate previously fixed for the owning company, this was, as to freight and passengers transported over both, a species of joint rate, within the meaning of the law; and the action of the commissioners was not ipso facto illegal on the ground that it was not a joint rate and was not authorized by the statute, if the rate so fixed was reasonable and just.

4. This would not be changed because there was no merger, but the two artificial persons remained in law separate.

5. How far the ownership of the stock and bonds of one railroad company by another connecting with it, and the method of their operation, and other circumstances, may be considered in rate making, and as affecting the reasonableness or unreasonableness of the rate fixed, is not now for decision, under the ruling made by the presiding judge.

6. Relatively to traffic between points on the line of the railroad company whose stock and bonds were owned by the other company, not passing over both roads, whether the application of the rate fixed for the other road would be legal would depend on whether it was reasonable and just, or unreasonable and confiscatory.

7. Where, on an application for injunction, there were issues both of law and fact, and the presiding judge granted the injunction, resting his decision solely on a point of law, and affirmatively showing that he did not pass upon the questions of fact or exercise his discretion thereon, the rule of discretion does not apply; and if the legal ground on which the judgment was rested was erroneous, a reversal will result.

8. If, upon the facts and the law applicable thereto, the presiding judge decides that an injunction should be granted, he is not precluded by this decision further than as to the points decided.

9. Circular No. 325 is a clear and complete fixing of a continuous mileage rate between the two roads, without the necessity for resorting to Rule Number 1 of the commission, to ascertain its meaning.

10. Whatever may have been the intention of the railroad commissioners,

45

they provided, in Rule 1, for a case where a majority of the stock in each of the two roads should be owned by one of them.

Argued April 16.—Decided July 12, 1907.

Injunction. Before Judge Gober. Cobb superior court. January 28, 1907.

The Wadley Southern Railway Company filed an equitable petition against Hill and others, railroad commissioners, seeking to enjoin the enforcement of what was known as circular No. 325. Upon the hearing the presiding judge granted the injunction prayed for. In granting the injunction he filed an opinion containing a statement of the facts upon which he based his views, which was as follows: "The petitioner in the above-named case brings its petition wherein it alleges it is incorporated under the laws of the State of Georgia, and owns and operates a railroad line from Wadley, Ga., to Rockledge, Ga., a distance of 37 miles, and a line from Wadley, Ga., to Collins, Ga., a distance of 54 miles, making a total mileage operated of 91 miles. The Wadley Southern Railway is a consolidation of two corporations—The Wadley and Mount Vernon Railroad and the Stillmore Air-Line Railway,— both the latter having been incorporated under the railroad laws of the State. These two roads were consolidated July 1, 1906. The Stillmore Air-Line Railway conveyed all its property and assets to the Wadley and Mount Vernon Railroad Company, which last-named company, on July 3, 1906, changed its name to the Wadley Southern Railway Company. The Central of Georgia Railway Company acquired all the stock and bonds of the Wadley and Mount Vernon Railroad Company on or about the 15th day of April, 1905, and paid therefor the sum of $200,129.02. It acquired all the stock and bonds of the Stillmore Air-Line Railway on or about the 10th of April, 1906, and paid therefor the sum of $451,091.85, assuming at the same time liabilities of the said company to the extent of $28,484.28—these two making a total for the Stillmore Air-Line Railway of $479,576.13—making an aggregate for the two purchases of $679,705.15, which amount, it is alleged, represents the fair value of the properties of the Wadley Southern Railway. Petitioner alleges, that the Wadley Southern Railway is a separate legal entity from the Central of Georgia Railway Company; that it has different officers and different boards of directors, and is operated absolutely independent of the

Central of Georgia Railway Company; that its accounts are kept separate, and its earnings are its own, and are not used by the Central of Georgia Railway Company, and its cash is kept separate and distinct from the Central of Georgia Railway Company, and it is in every respect operated as a separate and distinct piece of property. The Stillmore Air-Line Railway Company and the Wadley and Mount Vernon Railroad Company, it is alleged, have never been classified by the railroad commission higher than Class D, until now. The respondents filed an answer, wherein they admit that the plaintiff and the Central of Georgia Railway Company are separate legal entities, in that they are separate corporations. They allege that, for the purpose of enforcing the rules of the commission, they are one and the same corporation, being under the same control and management.

"Petitioner alleges, that the total outstanding capital stock of the Wadley Southern Railway Company is six thousand shares; that 5,989 shares of the capital stock are registered on petitioner's books in the name of the Central of Georgia Railway Company, the remaining eleven shares are registered in the name of the directors, one share each. The officers of the Central of Georgia Railway Company are: J. F. Hanson, president; A. R. Lawton, first vice-president; W. A. Winburn, second vice-president; T. S. Moise, general manager; W. C. Askew, assistant treasurer; W. B. Beymer, auditor; C. C. Williams, secretary; and the directors are: James A. Blair, W. C. Brantley, J. F. Hanson, W. B. Harold, Joseph Hull, S. R. Jaques, A. R. Lawton, G. R. McCormick, George J. Mills, J. G. Oglesby, Samuel Spencer, Charles Steele, W. A. Winburn, and J. W. English. The officers and directors of the Wadley Southern Railway Company are: H. P. Smart, president; W. A. Winburn, vice-president; W. C. Askew, assistant treasurer; W. D. Beymer, auditor; George H. Richter, secretary. Directors, H. P. Smart, W. A. Winburn, H. C. Perkins, H. R. Smith, A. D. Coleman, George H. Richter, W. J. Evans, S. L. Peterson, J. W. Mangum, and H. W. Johnson. The Stillmore Air-Line Railway Company and the Wadley and Mount Vernon Railroad Company have never been classified by the commission higher than Class D, until now. Under the rule for joint rates their rates were made, treating them as separate railroads.

"On October 26, 1906, the railroad commission promulgated

Circular No. 325, which was as follows: 'On and after November 26, 1906, continuous-mileage rates shall apply to the Central Railroad and the Wadley Southern Railway Company; that is to say, charges for transportation of passengers and shipments of freight passing between the above-named railroads or over any portion of either shall be assessed at the mileage rate for the distance hauled, governed by the freight and passenger tariffs prescribed by the Georgia Railroad Commission for the Central of Georgia Railway Company.' The Central of Georgia Railway Company was, by order of the commission, put in Class B. Previously it had been in Class C. The circular placing it in Class B, it appears, has been temporarily enjoined by the Federal court. Petitioner sets out figures showing that it is unable to earn any profit by operating its road under the tariff that would be put upon it by Circular 325. To my mind, however, there are controlling questions that determine this case without a consideration of those figures. The Wadley Southern Railway Company, it appears, has a charter from the State. It is admitted that it is a legal entity. It appears that it operates its own road and has its own organization. Paragraph 4 of article 4 of the constitution says: 'The General Assembly of this State shall have no power to authorize any corporation to buy shares or stock of any other corporation in this State or elsewhere, or to make any contract or agreement whatever with any such corporation which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts and agreements shall be illegal and void.' Section 5 of the act establishing the railroad commission says: 'The commissioners shall make reasonable and just rates of freight and passenger tariffs, to be observed by all railroad companies doing business in this State, on the railroads thereof; shall make reasonable and just rules and regulations, to be observed by all railroad companies doing business in this State, as to charges at any and all points for the necessary handling and delivery of freights; and shall make just rules and regulations as may be necessary for preventing unjust discrimination in the transportation of freight and passengers on the railroads of this State, and reasonable and just joint rates for all connecting railroads doing business in this State, for all traffic or business pass-

ing from one of said roads to another; provided, however, that before applying the joint rates to roads not under the management or control of one and the same company, the commissioners shall give thirty days' notice to said companies of the joint rate contemplated and of its division between said roads.'. This is all of said section that is in point here.

"Now, this petition is brought for the purpose of enjoining Circular 325, which has been hereinbefore set out. Defendants do not claim that the effect of the holding of the stock of the Wadley Southern Railway by the Central of Georgia is inhibited by the constitution on the ground that it prevents competition or creates a monopoly. If there was such insistence in this case, and that question could be litigated in this proceeding, it would be upon the defendants to bring in the Central of Georgia Railway Company and make it a party, so that that question might be considered. At least, this is one view of it. The Central of Georgia Railway Company has the right to own this stock, or it has not the right to own it. If it has the right, the Wadley Southern Railway Company, as is admitted by the defendants, is a legal entity, and the most that can be said of it, it would be a connecting railroad with the Central of Georgia Railway. If it has not the right to own it, it would be upon the State, by proper proceeding, to forfeit the charter of the Wadley Southern Railway Company and put it in liquidation, and let its rights and franchises go into the hands of the shareholders who have the right to own it. So long as the State allows the Wadley Southern Railway Company to be a legal entity and to operate its own railroad, it is a railroad company in the meaning of the act, and the commission would have no right to prescribe continuous-mileage rates upon it in connection with the Central of Georgia Railway. It is not necessary for me here to cite authority in reference to the fundamental principles of corporations. That is taken for granted. While a railroad company preserves its corporate existence and is run by its own officers, the railroad commission is compelled, under the law, to regard it as a distinct entity, and its rates would be fixed by the regulations applicable thereto. For these reasons the injunction is granted as prayed."

To the foregoing it is only necessary to add the following: The circular attacked is set out in the above opinion. One ground

of attack upon it was as follows: "The commission is without authority to prescribe mileage rates under circular No. 325, and the schedule of rates for the Wadley Southern Railway therein set out. Its power is limited, even in the case of railroads under the management and control of one and the same company, to the making of joint rates for connecting railroads; and petitioner's railroad and the railroad of the Central of Georgia Railway Company are connecting roads. . . The rates to be prescribed by the commission for connecting railroads of all kinds are to be joint rates, and not continuous-mileage rates." Rule No. 1 of the commission reads as follows: "Where in this State two or more connecting lines of railroad are operated by or under one management or company, or where the majority of the stock of each of the two or more railroad companies whose tracks connect is owned or controlled, either directly or indirectly by any one of such companies, the lines of railroad of all such companies shall, within the meaning and intent of the rules of the commission, be considered as constituting but one and the same railroad, and the rates for the carriage of freight over such railroads, or any portion thereof, shall be computed upon a continuous-mileage basis, the same as upon the line of a single railroad company, whether such railroads have separate Boards of Directors or not."

*John C. Hart, attorney-general, James K. Hines,* and *Joseph H. Hall,* for plaintiffs in error.

*Lawton & Cunningham* and *R. L. Gamble,* contra.

LUMPKIN, J.  1-6. The presiding judge granted an injunction to restrain the railroad commissioners from putting in force a circular known as No. 325, making "continuous-mileage" rates apply to the Central of Georgia Railway Company and the Wadley Southern Railway Company. The two railroads connect. The Central of Georgia Railway Company acquired all of the stock and bonds of two shorter roads, which were then consolidated and formed the Wadley Southern Railway Company. All of the shares of that company are registered on its books in the name of the Central of Georgia Railway Company, except eleven shares, which are registered in the names of the directors, one share each. The petition attacked the action of the railroad commissioners on two grounds: (1) for want of authority, under the law, to take it; (2) because, as to the Wadley Southern Railway Company, the rate so fixed was

unjust, unreasonable, and confiscatory. The presiding judge based his judgment solely on the first ground, and did not pass upon the latter question. He said, in his opinion: "To my mind, however, there are controlling questions that determine this case without a consideration of those figures. . . So long as the State allows the Wadley Southern Railway Company to be a legal entity and to operate its own railroad, it is a railroad company in the meaning of the act, and the commission would have no right to prescribe continuous-mileage rates upon it in connection with the Central of Georgia Railway." The question, therefore, is whether the making of continuous-mileage rates over these two connecting roads is per se illegal as being unauthorized by law, or whether its legality depends on what may be found as to the second contention, which was not decided.

The constitution of this State provides as follows: "The power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the General Assembly, whose duty it shall be to pass laws, from time to time, to regulate freight and passenger tariffs, to prohibit unjust discriminations on the various railroads of this State, and to prohibit said roads from charging other than just and reasonable rates, and enforce the same by adequate penalties." Article 4, section 2, paragraph 1 (Civil Code, §5797). The act of October 14, 1879 (Acts 1878-9, p. 125), provided for the appointment of railroad commissioners for the regulation of rates. Section 5, as amended by the act of 1889 (Acts 1889, p. 131), is codified in section 2189 of the Civil Code. It declares in part as follows: "The commissioners shall make reasonable and just rates of freight and passenger tariffs, to be observed by all railroad companies doing business in this State, on the railroads thereof; shall make reasonable and just rules and regulations, to be observed by all railroad companies doing business in this State, as to charges at any and all points for the necessary handling and delivering of freights; shall make such just and reasonable rules and regulations as may be necessary for preventing unjust discriminations in the transportation of freight and passengers on the railroads in this State; shall have the power to make just and reasonable joint rates for all connecting railroads doing business in this State, as

to all traffic or business passing from one of said roads to another. Provided, however, that before applying joint rates to roads that are not under the management and control of one and the same company, the commissioners shall give thirty days notice to said roads of the joint rate.contemplated, and of its division between said roads, and give hearings to roads desiring to object to the same."

It will be observed that the act declares that the commissioners shall make "just and reasonable joint rates for all connecting railroads doing business in this State, as to all traffic or business passing from one of said roads to another," and that by the .terms of the act the expression "joint rates" is applied whether the roads are under the management and control of the same company or not. If they are not, the commissioners are required to give thirty days notice of the joint rate contemplated, and of its division between the roads; and to allow hearings to roads desiring to make objection.

If the commissioners can fix a continuous-mileage rate, the authority must be derived either from the general power' to "make reasonable and just rates," or else from the special power to make joint rates, or from both. If it is given by the general authority to make reasonable and just rates, no limitation is stated as to applying it to connecting roads, save the constitutional and statutory restriction requiring it to be just and reasonable, not unreasonable and confiscatory. If it is to be referred to the special power to make joint rates, then the question arises whether the power to fix a "joint rate," as conferred by the statute, includes the power to prescribe a "continuous-mileage rate." It is not denied that such a rate can be fixed as to a single road, under the general power to make reasonable and just rates. But it is contended that the special power to make joint rates deals with the subject of connecting roads, and that the terms "joint rates" and "joint rate" do not include a continuous-mileage rate. The whole act, so far as it bears on the subject, should be looked to in determining the intent of a part of it. The act deals broadly with rate making. Its caption is: "An act to provide for the regulation of railroad freight and passenger tariffs in this State; to prevent unjust discrimination and extortion in the rates charged for transportation of passengers and freights, and to prohibit rail-

road companies, corporations and lessees in this State from charging other than just and reasonable rates," etc. If we consider the authority sought to be exercised as dependent on the provisions as to joint rates, is the contention of the defendant in error correct? What is "a joint rate" within the meaning of the statute? It is a rate prescribed to be charged for the transportation of goods or passengers over the connecting lines of two or more railroads, and to be divided among them for the service rendered by each respectively. Dealing, as we are, with a case where two roads only are involved, a joint rate, within the meaning of the act, is one rate which covers or includes within itself the whole charge to be made by both connecting roads for the entire service of transportation over them, and which is to be divided between them on account of the service rendered by each respectively. It is believed that this is a fair definition. The method by which the joint rate is fixed, or the division between the two made, is a matter of practical detail. The word "joint" has been defined to mean "produced by or involving the combined action of two or more; united in or having a common relation, action or interest; participated in or used by two or more; held or shared in common." See definitions in the following dictionaries: Standard, Webster's, Century, Worcester's. As a legal term, the word is generally used to mean joined together in unity of interest or liabilty. To illustrate by freight shipments: Freight is designated either as "local" or "through." As the terms are ordinarily employed, a shipment between points on the same line of road is "local" freight; "through" freight is that which comes to a railroad company from some other road, or which starts at some point on one line, but in order to reach its destination is turned over to a connecting carrier. It requires the services of two or more railways. This through or joint traffic requires a joint service; and to cover the joint service of the two roads (if there be but two) in transporting this joint traffic from the point of shipment to the point of destination, a joint rate is fixed, which is divided between them on some basis. We do not, of course, confine joint rates to two railroads but use language applicable to the case before us.

There is no exact and arbitrary rule on which the making of all joint rates must rest. Various circumstances must be considered. One method, and perhaps the most usual one, for

fixing a joint rate over two connecting railroads is by adding the two separate rates and deducting some per cent. designated; or, what amounts to the same thing, deducting a certain per cent. from each separate rate, and adding together the two rates thus reduced. But this is not exhaustive of all possible modes of making a joint rate. The statement in the statute that where connecting roads are not under the same management and control, the commissioners shall give notice not only of the contemplated joint rate but also of the division of it between the connecting roads, is in harmony with this view. If necessarily the two separate rates were merely added to make the joint rate, a notice of the intended division of the joint rate would not seem to be needed. Continuous mileage is a possible basis, provided the rate fixed is reasonable and just. If it is unreasonable and confiscatory, it is unlawful. But the mere fact that continuous mileage is taken as a basis for fixing joint rates does not ipso facto make a rate thus fixed unlawful as being unauthorized by the act creating the railroad commission. In their brief, counsel for defendant in error treat a "joint rate" and a "continuous-mileage rate" as two essentially separate and distinct things, and as if the former term, as used in the statute, was not broad enough to include the latter, or to authorize any joint rate on a continuous-mileage basis. After quoting a rule of the commission, that "no railroad company shall charge more than its maximum legal rate, less ten per cent., for its services in carrying a joint shipment," the brief adds: "Under joint rates the Central charges its local rate for the number of miles over its own road, less ten per cent., and the Wadley Southern charges its local rate for the number of miles over its road, less ten per cent. The sum of these two charges is the total rate for the shipment. Continuous-mileage rates are always lower than joint rates, because the rate per mile decreases as the distance increases." This statement as to a joint rate, however, is merely one instance of a joint rate, not a comprehensive definition of the term. It may be that the railroad commissioners have used the figures named in prescribing a limitation upon certain joint rates. But suppose, instead of ten per cent., they had prescribed a deduction of twenty per cent. from the two separate rates, or any other per cent., or no per cent. at all; or, instead of deducting a uniform per cent., had made the rate of shipment over the two connecting roads less

than the sum of the two separate rates on some other basis, the rate would be none the less a joint rate within the meaning of the act of the legislature. Nor would the fact that the railroad commissioners may have used the expressions above quoted operate to restrict the meaning of the words "joint rates," in the statute, to the particular instance then under consideration. In a word, it is in law possible to make a joint rate on a continuous-mileage basis; and the mere fact that this was done would not alone cause the rate so fixed to cease to be a joint rate within the meaning of those words as employed by the legislature. Whether, when made, such a rate would meet the requirements of the constitution and laws, or whether it would be unlawful for other reasons than that just mentioned, is another question. Our learned brother of the circuit bench seemed to treat the terms "joint rates," and "continuous-mileage rates," as so distinct that the latter was not included in the former within the meaning of the statute. He therefore did not decide the issue as to whether the employment of a continuous-mileage basis created a rate which was unreasonable and confiscatory. In this we can not concur with him. But we have directed his full opinion to be published, in order to show the facts which he deemed material and the ground on which he rested it.

It is true, as held by the presiding judge, that ownership of part or all of the stock of one corporation by another, if lawful, does not alone merge the legal existence of the two. A stockholder and a corporation in which the stock is held are in law two distinct persons. How far the ownership of the stock of one railroad company by another connected with it may be considered in rate making; or how far the roads, though preserving their separate legal existences, may be considered as parts of a system, and, if so, what joint rates or division of rates can be made with respect to them; and whether, if the two roads are operated under separate charters, though in connection with each other, the road, the stock in which is owned by the other company, must be considered as a separate and independent line for the purpose of determining the reasonableness of the rates thereon fixed by the State; and what consideration of the joint operation is to be given, are all questions which need not now be determined. A discussion of the subject of systems operated as units, and also where the component roads are separate, will be found in Beale & Wyman on

Railroad Rate Regulation, §441 et seq., and cases there cited. These matters involve or are intimately connected with the question of whether the rate fixed is unreasonable and confiscatory. And as already stated, that question, not having been passed on by the presiding judge, will not be dealt with by this court.

7-10. It was urged that the rate fixed was so unjust, unreasonable, and confiscatory as to the Wadley Southern Railway Company that an injunction should have been granted on that ground; and that even if it were granted on an erroneous ground alone, yet the judgment should be affirmed. In *Chestatee Pyrites Co.* v. *Cavenders Creek Gold Mining Co.*, 118 *Ga.* 255, it was held that "The rule that this court will not interfere with the discretion of the trial judge in granting or refusing an injunction where the evidence is conflicting does not apply when the question to be decided by the trial judge is one of law." In *Fears* v. *State,* 102 *Ga.* 275, it was said: "The decision in this case having been rendered on an erroneous view of the law, and, as stated by the judge, without the exercise of discretion as to the circumstances attending the proposed sale, the judgment, for the cause stated, is reversed." In *High Shoals Mfg. Co.* v. *Penick,* 127 *Ga.* 504, it was held that "The taxable situs of some of the personal property depended on an issue of fact; and as the judge refused an injunction (as certified by him) without exercising his discretion or considering the evidence, because of his construction of the law that no issue of fact was involved, the judgment refusing an injunction must be reversed." It will thus be seen that where the presiding judge bases his judgment granting or refusing an injunction upon issues of fact or of mixed law and fact, the rule of discretion applies; but where it affirmatively appears that he did not pass upon the questions of fact, and based his judgment solely on a point of law, and his ruling on that point was, in the opinion of this court, erroneous, the rule does not apply.

It has often been ruled that where a new trial has been granted, at least a first new trial, if the grant was proper on any of the grounds, it would not be reversed, although the judge may have based it upon a wrong ground. Indeed, as to the first grant of a new trial, though put by the presiding judge on some particular ground, the rule has been carried to the point of holding that the grant would not be reversed unless the evidence and the law re-

quired the verdict. *Weinkle* v. *Brunswick R. Co.,* 107 *Ga.* 367; *Elliott* v. *McCalla,* 123 *Ga.* 26. But this rule has not been applied to the grant of an injunction. To do so in the present case, where it appears that the presiding judge did not pass upon the issues of fact, would be substantially for this court in the first instance to pass on the facts, exercise the discretionary powers of a chancellor, and grant an injunction, although holding that it was error to grant it on the legal ground on which it was based. If, under the facts, and the law applicable thereto, the presiding judge should be of the opinion that an injunction should be granted for reasons other than that dealt with above, the ruling here made would not preclude him from passing upon that question.

Circular No. 325, which is set out in the opinion filed by the presiding judge, is complete in itself, and we have not considered it necessary to discuss what is termed rule No. 1 of the railroad commission, which is also set out in full in the statement of facts. It need only be said that one of the contingencies provided for, or sought to be provided for, is of very uncertain, if not impossible, occurrence. The first contingency provided for is where two or more connecting lines of railroads are operated by or under one management or company. The second is where the majority of stock of each of the two or more railroad companies 'whose tracks connect is owned or controlled, either directly or indirectly, by any one of such companies. The two roads here dealt with are the Central of Georgia Railway Company and the Wadley Southern Railway Company. For the language of the second branch of this rule as written to apply, the stock of each of these two companies must be owned or controlled either directly or indirectly by one of them; in other words, the Central of Georgia Railway Company must own or control not only a majority of the stock of the Wadley Southern Railway Company, but also a majority of its own stock. This is not claimed to be the case, and probably could not be so. It is suggested that the court should give this rule a reasonable interpretation. But where language is as plain and unambiguous as "where a majority of the stock of each of two . . railroad companies . . is owned or controlled by . . . any one of such companies," it would require, not construction, but amendment or modification, to make it mean something else than what it says. We may gravely doubt whether the railroad commissioners intended

to pass a rule covering the contingency here provided for, but it would be mere conjecture, not construction, to rule that it meant something else.

The language of circular No. 325, however, is clear and unambiguous in its terms, and prescribes the rates to which objection is made. It fixes a joint rate for freight and passengers passing between or over the two roads, and also the rate for freights and passengers over parts of the roads. If the two roads can be treated as comprising one line, this is clearly not objectionable for the reason now under consideration. If they be treated separately, the fixing of the joint rate and the rate on each in the same circular would not alone render it void. In either event, the lawfulness of the rates would depend upon the question of whether they were reasonable and just, or unreasonable and confiscatory. In fact counsel for defendant in error, in their briefs, treat this part of the case as being controlled by the question of power. They say: "It is immaterial whether or not the case falls within the language of this rule [Rule 1]. The question at last must rest upon the power of the commission under the act, which power is denied by the complainant."

No objection was raised to the putting into effect of this circular on the ground that there was not proper notice as to the contemplated rate or the division of it, under the statute. On the contrary, it is recited in the petition that the Wadley Southern Railway Company and the Central of Georgia Railway Company both appeared before the railroad commission and contested the right and power to apply the said freight rule and make continuous-mileage rates over the two roads, and that circular No. 325 is the judgment of the railroad commission in said matter, which is complained of.

*Judgment reversed. All the Justices concur.*