SOUTHERN BELL TELEPHONE & TELEGRAPH CO. v. RAILROAD COMMISSION OF GEORGIA et al.

(District Court, N. D. Georgia.  June 17, 1921.)

No. 160.

1. Telegraphs and telephones ⚹⟶33(1)—Notice of rate hearing before state commission waived.

On a hearing before a state Railroad Commission between two telephone companies relating to the division of joint tolls, the Commission held not without jurisdiction because the notice to the parties did not state the proposed rates and their division as required by statute, where both parties appeared and took part in the hearing without objection, and where each knew in advance the division contended for by the other.

2. Telegraphs and telephones ⚹⟶33(1)—State Commission held authorized to prescribe division of telephone tolls.

A state Railroad Commission, having statutory authority to make joint telephone rates and provide for their division, held to have power to prescribe the division of tolls between a company operating general lines and a local company with whose exchange such general lines were connected, on messages going over the lines of both, as "joint tolls," and as a matter of public concern, the division of the tolls having such relation to the rates themselves as might make a change in the latter necessary.

3. Telegraphs and telephones ⚹⟶33(1)—Statutory authority to regulate rates not affected by contracts.

Where a statute gives power to a state commission to regulate telephone rates, they cannot be removed from such power by contracts between parties.

In Equity.  Suit by the Southern Bell Telephone & Telegraph Company against the Railroad Commission of Georgia and others.  On motion for preliminary injunction.  Denied.

Hunt Chipley and McDaniel & Black, all of Atlanta, Ga., for petitioner.

J. K. Hines, of Atlanta, Ga., for defendants.

Before KING, Circuit Judge, and CLAYTON and SIBLEY, District Judges.

SIBLEY, District Judge. Against the enforcement of an order of the Railroad Commission of Georgia, which altered the division of telephone tolls as previously fixed by contract between the Southern Bell Telephone & Telegraph Company and Montezuma Telephone Company, an injunction pendente lite is sought by the Bell Company upon the ground that the obligation of the contract is impaired and the property right of contract taken without due process of law, contrary to the Constitution. It is also claimed that the Commission acted without statutory authority and without observance of a statutory requirement that 30 days' notice be given of the making of joint rates and the division thereof.

The Commission was established by an act of October 14, 1879 (Laws 1879, p. 127), with authority over railroads only. As amended in 1889 (Laws 1889, p. 131), the act authorized the Commission (Code 1910, § 2631) to—

"make for each of the railroad corporations doing business in this state, as soon as practicable, a schedule of just and reasonable rates and charges for transportation of passengers and freight   *   *   *"   and "from time to time and as often as the circumstances may require, to change and revise such schedules," and (section 2630) "to make just and reasonable joint rates for all connecting railroads doing business in this state, as to all traffic or business passing from one of said roads to another: Provided, however, that before applying joint rates to roads that are not under the management and control of one and the same company, the commissioners shall give thirty days notice to said roads of the joint rate contemplated, and of its division between said roads, and give hearings to roads desiring to object to the same."

An act approved August 23, 1907 (Code 1910, § 2662), provided:

"The powers and duties hereinbefore conferred by law upon the Railroad Commission are hereby extended and enlarged so that its authority and control shall extend to [besides other public service companies named] telephone  *  *  *  corporations, companies or persons owning, leasing, or operating public telephone service or telephone lines in this state."

Subsequently to the passage of all these acts, on August 11, 1908, the Bell Company, of the first part, and Montezuma Company, of the second part, entered into an agreement in part as follows:

"Whereas the first party  *  *  *  is now engaged in operating telephone exchanges and toll lines, and the second party proposes to operate a telephone exchange within a circle of one-mile radius from a central office in Montezuma, Ga., and desires to connect the same with the lines of the party of the first part as hereinafter provided, it is agreed  *  *  *  the second party shall make proper switchboard and other connections for direct communication between the stations on the lines of the first party and the exchange stations and toll stations of the second party.  *  *  *  For communications from the second party's exchange to outside points over the lines of the first party, the second party shall observe and shall require its subscribers to observe such regulations as the first party may from time to time make for the use of its lines, and shall itself pay to the first party the regular

tolls of the first party for the time being for all such connections whether from toll stations or subscribers stations, less a discount of 15 per cent. provided such discount shall not exceed ten cents for any one message."

On February 8, 1909, another similar agreement was made having reference to certain toll lines of the Montezuma Company extending to other towns, stipulating:

" * * * For the exchange of business permission is hereby granted to connect the lines covered by this contract with the lines of the party of the first part through the sublicensed exchange of the second party at Montezuma. * * * For connections passing over the lines of both parties each party will take a share of the through tolls pro rata according to the air line distance to point of transfer."

Both contracts were terminable on 30 days' written notice from either party. On June 2, 1909, these contracts were modified so that the Montezuma Company was to have on messages from its exchange 15 per cent., not to exceed 20 cents on any one message, and on messages into the exchange 3 cents each, and on toll line messages 15 per cent., not to exceed 20 cents on any one message, on both outgoing and incoming messages. In 1914, experience showing the substantial correctness of it, 25 per cent. was agreed to be retained by the Montezuma Company on all tolls it took in in lieu of all the above charges. October 8, 1920, the Montezuma Company complained by letter to the Railroad Commission that its increased expenses prevented the handling of the business on this basis longer, that they had declined to sign a new contract on the basis of 25 per cent. of tolls on outgoing messages, and that the Bell Company had cut the compensation to 22½ per cent., and ending:

"We claim that we lose money in handling their business even under the former contract and if your body has authority to take up the matter we would be glad to have you go into the matter of just compensation for our service in handling this business. We feel that we should be paid 25 per cent. on both outgoing and incoming business."

The Railroad Commission sent this letter to the Bell Company, which replied at length, setting forth its contentions. The Commission then set the matter for a hearing 32 days later, giving each side notice of the date.

[1] 1. The proceeding was entirely informal. No notice was formally given by the Commission stating the proposed joint rates and the division of them, as required by the quotation from the act above made. Both parties appeared at the time set. Neither objected to the want of notice. After the chairman of the Commission had expressed the opinion that the Commission could not arbitrate their contract rights, but could only fix future rates, the Bell Company, while taking the position that the Commission was without authority in the premises, announced that it was ready to go into the trial and the hearing was had. The letter of the Montezuma Company to the Commission, sent by the Commission to the Bell Company, contained a statement of the then division of the tolls, of its claims, and of its contention for 25 per cent. on all messages—the proposed division of tolls. This gave all the information that a formal notice would and the 30 days' time was actual-

ly had. The purpose of the required notice was substantially attained, and by proceeding with the hearing without objection the Bell Company waived formal notice, as it might do. Code 1910, § 10. Want of proper notice was not even set up in the original bill, but only by an amendment made at the hearing before us.

[2] 2. But it is claimed that the dispute was not one over which the Commission had power, in that it involved, not a joint rate and its division, but the compensation for a local service rendered by the Montezuma Company to the Bell Company which might be fixed by private contract, and in which the public had no interest. The act of 1907 extending the powers and duties of the Commission to telephone and other companies made applicable to them all the provisions formerly existing as to railroads, so far as they could be applied. It gave the Commission power to regulate telephone rates (City of Dawson v. Dawson Telephone Co., 137 Ga. 62, 72 S. E. 508) and electric power rates (Union Drygoods Co. v. Ga. Public Service Corp., 142 Ga. 841, 83 S. E. 946, L. R. A. 1916E, 358). The quoted provision as to joint railroad rates is therefore to be read, for the purposes of this case, by substituting the words "telephone lines" for railroads and "telephone messages" for passengers and freight. So read, the Commission has power to fix joint telephone rates for connecting lines and the division thereof, and from time to time to revise and alter them. As defined by the Supreme Court of Georgia:

"'A joint rate' * * * is a rate prescribed to be charged for the transportation of goods or passengers over the connecting lines of two or more railroads, and to be divided among them for the service rendered by each respectively." Hill v. Wadley Southern R. R. Co., 128 Ga. 705, 57 S. E. 795.

Both the contracts here involved provide for the physical connection of the lines of the two companies through the Montezuma exchange and the transmission of telephonic messages over the lines of both companies so connected. And this is what was done. The rate charged for the message is a joint rate within the language of the statute and of the definition of the Supreme Court. This is conceded as to the Montezuma Company's toll lines, but denied as to its exchange lines. There is no difference in what is done on each. In each case the message passes from or to the customer of the Montezuma Company to or from one of the Bell Company over the connected lines of both. The only difference is that the toll lines of the Montezuma Company are used presumably only for single messages separately paid for, and the exchange lines are used also for general local telephoning, for which a fixed charge is made. There is no proof that this exchange rate has any connection with the long-distance service, that it was raised, by agreement with the subscribers, when the long-distance service was instituted, or that this service has been included by the Railroad Commission in passing on the local exchange rates. There is nothing to hinder the natural conclusion that, when an exchange line is connected with the line of the Bell Company and so used, the toll collected for the message is a joint toll "charged for the transportation of messages over the connecting lines of two or more telephone companies, and to be

divided between them for the service rendered by each respectively," paraphrasing the language of the court. In the Tap Line Cases it was contended that the connection with the trunk lines of certain short lines fed mostly by particular industries was to be considered as a mere "plant facility" or "switching service," and that they were not entitled to enjoy joint rates. The Interstate Commerce Commission so ruled, but the Supreme Court held that they were co-operating common carriers and deserving of a joint rate adjusted to the service rendered by each. Tap Line Cases, 234 U. S. 1, 34 Sup. Ct. 741, 58 L. Ed. 1185. And, though in the division of the joint rate established short-distance hauls were called "switching,"᾽ and a flat charge of $2 or $3 fixed, the division was held within the power of the Commission. Tap Line Cases, 240 U. S. 294, 36 Sup. Ct. 313, 60 L. Ed. 651. It is the connected service for a single charge rather than the particular rate fixed or the division established that makes a joint rate. Hill v. Wadley Southern R. R., 128 Ga. 705, 57 S. E. 795.

The division of a joint rate is implied in its fixing. The joint rate is really the combination of the compensations fixed for the participating lines. A reconsideration of the division involves a reconsideration of the elements of it, which may affect ultimately the total. In this case, if no alteration of the agreed division were allowed, the burden of expense might have terminated the service on the part of the Montezuma Company, or even caused the failure of the company. And the allowance to it of a larger share from the present rate might involve the necessity of ultimately raising the rate in order to sufficiently compensate the Bell Company. So, while it might seem that the public had no interest in the mere division of an uncontested rate with the result that when alone attempted it would be without the functions of a rate commission, yet on closer examination it will appear so intimately involved with the rates themselves as to be inseparable from them and so of public concern. That the Commission understood it was passing upon the division of a joint rate is sufficiently shown by the caption of the order and the language of its body. Aside from the challenge of the power to make the order, no question was raised on the hearing of its propriety.

[3] 3. There is a plausible contention that the contracts had been abandoned, but we deal with the case as though they were still of force. The contention that, if the order was within the statutory power as the division of a joint rate, it yet was unconstitutional as impairing the obligation of the contracts and taking property in them without due process of law, cannot be sustained. The Legislature had declared the public telephone business to be one of public concern and subject to regulation prior to the making of these contracts. "One whose rights, such as they are, are subject to state restriction, cannot remove them from that power by making a contract about them. The contract will carry with it the infirmity of its subject-matter. Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 28 Sup. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420,

affirming 142 Ga. 841, 83 S. E. 946, L. R. A. 1916E, 358, 145 Ga. 658, 89 S. E. 779; City of Dawson v. Dawson Telephone Co., 137 Ga. 62, 72 S. E. 508.

No substantial reason for interference appearing, a preliminary injunction will be refused.